Martin E. SCHMIEDING, doing business as Western Plains Insurance Agency, Plaintiff,

v.

AMERICAN FARMERS MUTUAL IN-SURANCE COMPANY, Defendant.

Formerly Civ. No. 26–52, Lincoln Division.

United States District Court D. Nebraska.

Sept. 30, 1955.

Supplemental Opinion Nov. 12, 1955.

William M. Grossman, Johnston & Grossman, Lincoln, Neb., for plaintiff.

F. B. Baylor, Warren K. Urbom, Baylor, Evnen & Baylor, Lincoln, Neb., for defendant.

DELEHANT, District Judge.

This action was instituted in the District Court of Lancaster County, Nebraska, and was removed to this court.

The removal was warranted and validly effected. Plaintiff is a citizen of Nebraska. Defendant is an Illinois corporation, therefore, a citizen of Illinois, and is authorized to do business in Nebraska; and the plaintiff's claim, even without his demands for accounting, infra, is for $5,300 and interest thereon and costs.

In Count I of his petition (to use the state court's characterization) plaintiff first identifies the parties; then alleges his own engagement in the operation within Nebraska of a general insurance agency under the name of Western Plains Insurance Agency; the execution between the parties on or about January 1, 1950 of a written contract whereby plaintiff was employed as district manager of defendant's business in Nebraska, of which contract a copy is set out as an exhibit to the petition and a copy is incorporated herein by way of a footnote [1] the entry by the parties into a

---

1. "District Manager's Agreement

"Made And Entered Into by and between the American Farmers Mutual Insurance Company, of Chicago, Illinois, and the National Retailers Mutual Insurance Company, of Glen Cove, New York (Hereinafter known as the "Companies") and *Western Plains Insurance Agency of Lincoln, Nebraska* (hereinafter known as the "District Manager") witnesseth:

"In Consideration of The Mutual Obligations of The Parties Hereto, It Is Agreed:

"1. That Western Plains Insurance Agency is hereby appointed district manager of the farm department for the companies in the Counties of All State of Nebraska.

"2. This agreement renders null and void any and all previous agreements by and between the companies and the district manager.

"3. It is understood and agreed that the District manager is being compensated for the express purpose of maintaining the present policies in force in his district, and to develop new business, and for building an agency force of sufficient size to properly develop his district.

"4. The companies may at any time offset against any commissions or other remuneration due or to become due to the District manager, or anyone claiming through or under the district manager, any debt or debts due or to become due from the district manager to the companies.

"5. This agreement shall take effect upon the 1st day of January 1950 and shall continue in full force and effect from such date, until the end of the current calendar year and from year to year thereafter, except that the same may be cancelled by either party hereto as of any date by giving prior notice in writing to the other party of the termination.

In event of termination of this contract by either party hereto, the district manager shall not be entitled to receive compensation after the date of such termination, except any unpaid overwriting on business issued prior to the date of termination accordance to the schedule of overwriting attached to this agreement.

"6. Any notice required by this agreement shall be given as follows: (a) if by the companies to the Manager, by delivery thereof to the Manager personally, or by mailing thereof to the address of the Manager last shown on the records of the Companies; (b) if by the Manager to the Companies, by delivery at or mailing to the Home Offices of the Companies at 4750 Sheridan Road, Chicago, Illinois.

"Furthermore, The District Manager Agrees:

"1. To secure and train a sufficient number of agents to service and develop the entire district. All agents are to be trained in the Companies' sales and maintenance methods and shall meet the companies' approval.

"2. To properly assign territory to local agents. To Notify the companies of such assignments and of any changes at the time of such changes and the territory involved, and to forward signed agent's agreements to the Companies.

"3. To establish a regular system of contact through letter, telephone and personal calls with all agents in his district.

"4. To assist each agent, so that the agents can fully and properly carry out the companies' sales plans.

"5. To see that all correspondence from the companies to the district is promptly followed up and reported on.

"6. To keep up-to-date at all times individual production records of each local agent, on forms furnished by the companies.

"7. To report to the companies on

forms furnished by the companies a summary of activities in the district.

"8. To keep a record of all active and cancelled policy holders in the district.

"9. On termination of this agreement by the Companies or the Manager, any and all moneys belonging to the Companies in the possession of the manager, and all indebtedness due the companies from the Manager shall be immediately paid them by the Manager, and all policies, applications, advertising documents, papers, books, records and copies in whole or part thereof pertaining to the District or the Companies shall be surrendered and relinquished forthwith to the ownership of the Companies.

"10. The district manager shall not make or permit to be made by any agent, any use of the radio or insert any advertisement respecting the companies in any paper, or other matter, magazine, newspaper, periodical, or other publication or issue any circular or paper referring to the companies without the written consent of the companies.

"11. The district manager shall possess no authority not herein expressly granted and is not authorized on behalf of the companies to make, alter or discharge contracts or binders, except as may be directed in writing by the companies, nor to waive forfeitures, grant permits, guarantee in dividends, if any,

name extra rates, extend the time of payment of any premium waive payment in cash, or to write receipts except for first premiums, or make any endorsements on the policies of the companies, and shall receive no further remuneration for any service except as herein provided. It is expressly stipulated and agreed that the district manager is not authorized to incur any indebtedness or liability in the name or in behalf of the companies for any advertising, office rent, clerk hire, or any other purposes whatsoever or to receive any moneys due or to become due the companies exclusive of the first premium, except as may be specifically directed by the companies and the powers of the district manager shall extend no farther than are herein expressly stated.

"12. To secure from said district an annual volume of casualty and fire insurance in such amounts as may be agreed upon each succeeding year.

"13. It is expressly understood and agreed that this instrument embodies all agreements existing between the companies and the Manager and that no term, provision, or condition of this agreement shall be held to be altered, amended, changed or waived in any respect except by written endorsement attached hereto.

"Furthermore, The Companies Agree:

"1. In return for these services, to compensate the District Manager as set forth in the schedule attached to and forming a part of this agreement. Said schedule may be changed from time to time at the discretion of the companies, or supplemental schedules may be added from time to time.

"2. To furnish such sales helps to the district manager for the agents in his district as the companies may prepare.

"In Witness Whereof, the parties hereto have hereunto set their hands and seals in duplicate this 10th day of January, 1950.

"American Farmers Mutual Insurance Company
"National Retailers Mutual Insurance Company
"By L. J. Bennett V.P. (Seal)

"Western Plains Insurance Agency (Seal)
"By M. E. Schmieding"

"District Manager's Schedule of Compensation Casualty

"The following schedule of compensation payments and conditions is to be attached to and form a part of the District Manager's Agreement.

"Payments under the following schedule will be made on only the particular Insurance written by the company in the territory to which the District Manager is assigned as follows:

"New business overwritings will be paid on all business produced by the manager's agents, regardless of the policyholder's place of residence; Renewal business will be paid according to the policyholder's place of residence, regardless of the agent procuding (sic) it.

"1. Schedule of Compensation

| Coverage | Original Writing | Renewal |
|---|---|---|
| **Automobile Insurance** | | |
| Fire and Comprehensive | .10—5% | 5% |
| Theft | .10—5% | 5% |
| Collision (Deductible) | .20—5% | 5% |
| (80–20) | .25—5% | 5% |
| Bodily Injury and Property Damage | .25—5% | 5% |
| School Bus | 5% | 5% |
| Fleets First $1,000 Premium | 5% | 5% |
| Over 1,000 Premium | 3% | 2% |
| Other automobile | 5% | 5% |
| **General Liability** | | |
| All Forms | 5% | 5% |
| **Miscellaneous Casualty** | | |
| All Forms | 5% | 5% |
| **Accident Insurance** | | |
| Individual—All Forms | 5% | 5% |
| **Hospital Insurance** | | |
| Individual—All Forms and Family 8 | 5% | 5% |
| **Compensation** | | |
| Commercial & Industrial Small Risks | .50—1% | 1% |
| **Group Insurance** | | |
| All Forms— | | |
| Up to $5,000 | 2% | 1% |
| $5,000 to $30,000 | 1% | ½% |
| $30,000 to $50,000 | ½% | None |
| Over $50,000 | None | None |
| **Boiler and Machinery Insurance** | | |
| First $1,000 Premium | 5% | 5% |
| Over $1,000 Premium | 2% | 2% |
| **Fire Insurance** | | |
| Class A. | | |
| Dwellings, Household Apartments, Brick Merc. bldgs. | 5% | 2% |
| Class B. | | |
| All Other Fire Mfg. & Special Hazards Prohibited | 2% | 1% |
| Class C. | | |
| Motor Cargo Yacht | 2% | 1% |
| Class D. | | |
| Other Inland Marine | 5% | 2% |

"2. Conditions

"a. A charge back of the same percentage will be made for premiums returned on policies cancelled during the first policy period.

"b. Payments will be made only after premiums are received in cash in the home office for the particular insurance to which the compensation applies.

"c. It is hereby agreed that at such time the renewal income in the counties named in this contract has reached the amount of ——— Dollars annually that said local agent's contract signed by District Manager will terminate and he will cease to produce any person business, devoting his entire time to hiring, training and developing agents in his territory.

"American Farmers Mutual Insurance Company

"National Retailers Mutual Insurance Company

"By L. J. Bennett V. P.

"Western Plains Insurance Agency

"District Manager

"By M. E. Schmieding"

**172**

further agreement and arrangement[2], wherein plaintiff agreed, to countersign as the licensed resident agent all policies written and executed by defendant in Nebraska, in the words, "Martin E. Schmieding licensed resident agent", which signature was made by the use of a rubber stamp bearing a replica of the signature and handwriting of plaintiff, which stamp the parties undertook to use in accordance with such agreement and arrangement; the approval of such agreement and arrangement by the Nebraska State Department of Insurance; that defendant stamped plaintiff's name as defendant's licensed resident agent on insurance policies, by defendant written and executed in Nebraska under that agreement and arrangement; the provision under the agreement and arrangement that the total of all premiums on insurance written by defendant in Nebraska be forwarded to defendant, which, thereupon, computed and paid to plaintiff the amounts due therefrom to him, under the schedule attached to the agency contract; the notification by defendant to plaintiff on or about August 20, 1950[3] of defendant's decision to terminate the district manager's agreement but defendant's failure and refusal, at the time of such termination, to make any accounting and settlement of compensation due to the plaintiff under the agreement; defendant's failure and refusal to pay plaintiff all such compensation, of which at the time of such notice and termination more than $200—the exact amount thereof not being within plaintiff's knowledge—was due and payable. The prayer of that count is for an accounting of all Nebraska policies and renewals written by defendant from January 1, 1950 to August 30, 1950 and for judgment against defendant in the amount found therefrom to be due to plaintiff.

In Count II of the petition plaintiff, by reference, re-avers all of the allegations of Count I touching matters occurring prior to the termination of the district manager's agreement and repeats the averment touching .termination (with this variation, that its date is asserted to be August 30, 1950) and failure to account for and pay the amounts then due to plaintiff. He then alleges that notwithstanding, and subsequent to, the cancellation by defendant thus pleaded, defendant disregarded such cancellation, and took and continued to take advantage of the relation of the parties, and pretended that plaintiff was still its resident agent and district manager and continued to use the stamp bearing plaintiff's name for the purpose of impressing it upon Nebraska policies written by defendant, and used agents in defendant's behalf theretofore procured by plaintiff for the continued solicitation of insurance business in Nebraska, but despite plaintiff's demand therefor, has failed to account to or pay plaintiff any commission on such business, within the alleged contemplation of the resident manager's agreement. The prayer of that count is for an accounting of policies and renewals by the defendant written in Nebraska from August 30, 1950 until such time as it shall be determined to have ceased to operate under such agreement and arrangement, and for judgment in such amount as may be determined therefrom to be due plaintiff.

In Count III of the petition, plaintiff by reference again repeats the allegations of Count I touching matters occurring prior to the termination of the agreement by defendant, and, then, repeats the assertion of the defendant's notice of termination, once more fixing it as occurring on August 30, 1950. He then asserts that upon its termination

---

2. Which plaintiff alleges was a part of the agreement set out in footnote 1.

3. It is probable (vide infra) that he means to designate August 30, 1950. Even that date is mistaken, for (see factual findings, infra) the cancellation occurred September 30, 1950 and was effective October 1, 1950, that is, at the close of business September 30, 1950.

of the arrangement, defendant made no other or further arrangement with plaintiff and did not compensate plaintiff in any respect. And he adds this final assertion:

"That said defendant has disregarded its said notice to terminate the said agreement and arrangement; that said defendant has taken advantage of the position of the plaintiff and has continued to use the said name of Martin E. Schmieding as the resident agent on its policies written and executed in the State of Nebraska after giving plaintiff notice of its decision to terminate said agreement and arrangement; that said defendant continued and has continued for some time thereafter to stamp said plaintiff's name on its policies of insurance executed by said defendant in the State of Nebraska without authority and approval of said plaintiff; that the defendant continued to hold out and represent that said plaintiff was its resident agent and District Manager in and for the State of Nebraska; that said defendant has been able to sell insurance on the representation that said plaintiff recommends said defendant and that he is its resident agent and District Manager; that plaintiff is an officer of an insurance company doing business in the State of Nebr.; that said plaintiff has been irreparably damaged by the defendant's continued use of his name; that defendant has no right to continue to use plaintiff's name after notifying the plaintiff of its decision to terminate the aforesaid agreement and arrangement; that plaintiff feels legal action may be taken against him by persons relying on said representation; that said plaintiff has been placed in an unfavorable position; that said plaintiff may be served with process in legal proceedings and subject to some liability; that said plaintiff's name has been injured; that de-fendant's conduct and activity has impaired plaintiff's reputation; that this plaintiff has been injured and damaged in the amount and sum of over $5,000.00; that said plaintiff has incurred expenses proximately caused by said defendant's continued use of his name; that plaintiff has incurred telephone and automobile expenses in attempting to refute and destroy the said representation; that plaintiff has incurred expenses in the amount and sum of over $300.00."

It is upon that count that plaintiff prays for judgment for $5,300, with interest and costs.

Plaintiff, later and on May 16, 1953, filed a Supplementary Complaint, in which he alleges the institution of this action on May 10, 1952 and re-avers by reference the allegations of his petition, and by way of supplement alleges:

" * * * that said defendant after plaintiff's petition and complaint was filed, continued to take advantage of the position of the parties hereto; that said defendant has continued and is now continuing to take advantage of the plaintiff and is using plaintiff's agents to sell insurance for said defendant in the State of Nebraska; that said defendant has been and is receiving benefits from plaintiff's agents; that said defendant has continued to operate under the said agreement and arrangement but has failed and refused to compensate the said plaintiff in accordance with the terms of said agreement and arrangement, after demand made; that plaintiff should be compensated in accordance with said agreement and arrangement for all insurance business produced by plaintiff's said agents from the 10th day of May, 1952, to the filing date of this supplementary complaint;"

And he prays further for an accounting of all policies of insurance or renewals by defendant written in Nebraska from May 10, 1952 to the filing of the supple-

mentary complaint produced by agents secured by plaintiff or until defendant ceases to use plaintiff's agents or to operate under the arrangement and agreement and for judgment in the sum found from such accounting to be due to plaintiff.

Defendant, by way of answer to the petition itself, admits its own incorporation in Illinois; its maintenance in Chicago of its principal place of business; its qualification to do an insurance business in Nebraska; the making between the parties of the agreement copied in footnote 1; their making of a further agreement or arrangement whereby plaintiff agreed to countersign as the licensed resident agent all policies written in Nebraska by defendant, through the use of a rubber stamp of the character described in the petition which stamp was to be used by defendant in accordance with such further agreement and arrangement; that the agreement for the use of the stamp was approved by the Nebraska State Department of Insurance; that defendant did use the stamp for the affixing of plaintiff's name as its resident agent on policies of insurance by it written in Nebraska; that under the district management agreement all premiums on policies of insurance in Nebraska written by defendant were to be forwarded to Nebraska and the defendant ascertained and remitted to plaintiff the amounts to which plaintiff was entitled out of such premiums; the notification to plaintiff by defendant of the termination by defendant of the agreement shown at footnote 1 [4]; that after such notice defendant continued to use the stamp to impress plaintiff's name on policies of insurance in Nebraska written by defendant; and that plaintiff is an officer of an insurance company doing business in Nebraska. Defendant's answer otherwise denies the allegations of the petition. The answer then alleges that defendant's letter to plaintiff giving notice of termination of the District Manager's agreement was mailed September 30, 1950; that on or about January 10, 1950 defendant, with the approval of the Department of Insurance of Nebraska, issued to plaintiff a license to act as agent of defendant for the period ending May 30, 1950, which was renewed for successive periods of one year on May 1, 1950 and on May 1, 1951 and was in force and effect during the period between January 10, 1950 and May 30, 1952 [5]; that throughout all that period plaintiff was a duly authorized agent of defendant with the right and authority to solicit on behalf of defendant the writing of insurance business in Nebraska; that the right to act as countersigning agent arose from and existed under the license just alleged and not by virtue of the District Manager's agreement; that the District Manager's agreement and the agreement under which such license was issued and the plaintiff's right to countersign policies arose, were separate and distinct and defendant did not cancel the latter of such agreements; that plaintiff in writing on March 3, 1950 authorized defendant to use on all automobile policies by it issued in Nebraska the rubber signature stamp above referred to; that plaintiff did not withdraw that authority prior to September 12, 1951; that on September 12, 1951 defendant discontinued the use of the rubber stamp and has not used it since that date; and that it has paid plaintiff in full all commissions earned by him and all compensation to which he was entitled under the agreement shown in footnote 1.

For answer to the supplementary complaint, defendant admits the institution of this action on May 10, 1952 and its removal thereafter to this court; renews the admissions, denials and allegations of

4. The answer does not allege in the admission the date of giving or the effective date of this notice, but later affirmatively alleges that the notice was mailed September 30, 1950. See factual finding with respect thereto.

5. The correct expiration date was apparently April 30, 1952.

its principal answer, supra; and denies the allegations of the supplementary complaint quoted verbatim, supra.

Upon the issues thus made the action has been tried to the court without a jury. Evidence has been received and considered and the briefs and arguments of counsel have been examined and considered. The case is ready for final ruling. The facts will first be announced as they are found; after which the conclusion of the court will be announced. In determining what facts are found counsel will consider that all facts admitted or agreed upon in the pleadings are found to be true without the necessity of formal restatement.

The defendant, by way of opening statement, formally admitted that for the period January 1, 1950 to October 1, 1950 it owed, and at the time of the trial still owed, to plaintiff the sum of $33.37 and made tender to the plaintiff of that sum. That admission is noted and will be kept in view.

Martin E. Schmieding is, and at all material times has been, a resident of Lincoln, Nebraska. While his exact age is not disclosed in the record, he is manifestly beyond middle age. For many years he has been engaged in various phases of the insurance business in Nebraska with his principal headquarters in the city of Lincoln.

Since about the year 1938, he has operated Western Plains Insurance Agency. It is an unincorporated business solely owned and managed by plaintiff. In its name and through its offices, plaintiff since its organization, has conducted a general insurance agency which represents various companies, but particularly Western Plains Insurance Company, infra.

In May, 1948, plaintiff organized Western Plains Insurance Company which is still in existence and operation. While it is a mutual company, for practical purposes plaintiff controls it and is its chief executive officer and general manager. It engages in the business of writing hail and crop insurance in Nebraska.

Since the organization of Western Plains Insurance Company and through an arrangement erected by plaintiff, its insurance has been written through Western Plains Insurance Agency and by local agents procured through Western Plains Insurance Agency. Effective January 1, 1950, an arrangement was in operation whereby for such services Western Plains Insurance Company undertook to pay to Western Plains Insurance Agency as a fee for such services the sum of $5,000 annually. The evidence does not disclose how long that arrangement has been in force or with what measure of fidelity it was complied with before 1950.

The defendant American Farmers Mutual Insurance Company is and at all times material herein has been an Illinois corporation engaged in the insurance business, and particularly in the writing of automobile insurance policies. In part at least it has the same managing officers and employees as National Retailers Mutual Insurance Company, which wrote and writes insurance against fire, and possibly other casualties on buildings and merchandise.

While it clearly appears that National Retailers Mutual Insurance Company joined with the defendant in the execution of the district manager's agreement with plaintiff, immediately hereinafter referred to, it need not be given practical further consideration in this case because the issues herein arise only by virtue of transactions between the plaintiff and defendant.

On or about January 1, 1950 plaintiff participated in certain negotiations with defendant and National Retailers Mutual Insurance Company, looking to the making of an arrangement and agreement whereby plaintiff (under the name and style of Western Plains Insurance Agency) would be made and become district manager for those two insurance companies for the state of Nebraska. In furtherance of such negotiations a meeting was had at Omaha in which the plaintiff and one Sam Schwartzkopp on the one

side participated, and on the other Mr. L. J. Bennett, Executive Vice President of defendant, and Mr. Robert Doherty, then State Manager of the defendant for Nebraska and Iowa, but not now associated with the defendant, and a further party whose name seems not to be disclosed. The precise date of the Omaha meeting may not be set down with certainty for the reason that the evidence concerning it is irreconcilable and inexact and there appear to be no memoranda from which the date may be positively determined; but it was not earlier than January 1 and not later than January 10, 1950.

After considerable discussion between those conferees an agreement was executed at the Omaha meeting bearing date January 10, 1950, but effective from and after January 1, 1950, of which a copy is set out in footnote 1. It may be noted that as originally drawn the instrument included as the first of the agreements undertaken by the district manager the following: "to spend full time representing these companies and not to represent any other company, firm or person." That clause, not now shown in footnote 1, was stricken by the agreement of the parties, initialed by Mr. Bennett on March 31, 1950 and by the plaintiff on April 3, 1950. As a consequence, in copying the agreement into the petition (vide footnote 1) the numbering of paragraphs was modified by the omission of the original first paragraph and the reduction by one of the numerical designation of each succeeding paragraph.

Within a very few days, certainly not more than a week, and possibly as early as the next day, after the Omaha meeting, Mr. Doherty called on plaintiff at the latter's Lincoln office and on that occasion discussed with plaintiff various details of the initiation of operations under the written agreement. In that discussion it was arranged that local agents' contracts were to be secured, approved and signed in behalf of defendant by plaintiff.

Doherty and plaintiff also discussed at that time as a matter of detail the method of the signing and mailing to the policyholders of Nebraska insurance policies issued by defendant. It was then agreed that as a starting method all policies, as issued at the home office of defendant, would be transmitted by mail to plaintiff and would be countersigned by plaintiff as a licensed resident agent of defendant, and thereupon mailed by plaintiff to the policyholders. That initial method of operation was pursued for a brief period of time. But it was found to be cumbersome and time-consuming, and also expensive in that it involved multiple handlings of a single policy.

After experimenting with it for a short period of time, and late in January 1950, a further conference was had at Lincoln in which plaintiff and representatives of defendant sought to erect a device by which such countersignature would be simplified and made less expensive; and an arrangement was put into effect and used for a very short while whereunder one or another of the employees of the defendant in its Chicago office, with plaintiff's express approval, signed upon policies the name of plaintiff as licensed resident agent of the defendant.

Still later, and in a conference at Lincoln between Doherty and plaintiff, it was agreed that a rubber stamp should be prepared bearing a facsimile of the signature of plaintiff as licensed agent for defendant and placed in the custody of defendant at its home office with authority in the defendant to impress the signature of plaintiff as such agent on individual policies issued by defendant through the use of the stamp. That method of operation was on February 27, 1950 approved by a representative of the Department of Insurance of the State of Nebraska. The rubber stamp was prepared and placed in the possession of defendant and on or about the 3rd day of March, 1950 plaintiff, by letter directed to defendant, formally authorized its use. The defendant on the receipt of the stamp and plaintiff's approval began and continued the use of the stamp.

Shortly after the execution of the district manager's agreement and in direct relation to the proposed and eventually effected arrangement for countersignature of defendant's policies by plaintiff, representatives of defendant, and plaintiff in his own behalf, discussed the necessity of obtaining from the Department of Insurance of the State of Nebraska a license for plaintiff to act as a local agent for defendant. Such license was procured for the period ending May 1, 1950 (or at the close of business April 30, 1950) and the fee therefor was paid by plaintiff. Plaintiff also caused, and paid for, the renewal of the license effective for the year commencing May 1, 1950. On the expiration of that license which occurred May 1, 1951 (or April 30, 1951), plaintiff made no effort to procure the renewal of his license, but some time thereafter defendant caused it to be renewed and by mistake caused the certificate evidencing the license to be sent to one Fass, also a local agent of defendant, residing at Johnson, Nebraska, along with a similar license to Fass, by whom about September, 1951 it was sent or delivered to plaintiff.

At the time of the execution of the district manager's agreement, plaintiff, in his operation of Western Plains Insurance Agency was in contact with several local agents who regularly wrote hail and crop insurance for Western Plains Insurance Company through Western Plains Insurance Agency. Plaintiff considered, and as a witness referred to, them as "his" agents. However, they appear, so far as there is evidence on the point, to have been men engaged generally in the local solicitation of insurance business with several insurance companies as their principals, of which Western Plains Insurance Company was one. In his negotiation for the district manager's agreement plaintiff discussed the existence and availability of these agents and stated that he could procure all or nearly all of them for service as agents of defendant. In actual experience some twenty-three or twenty-four (and probably twenty-four) of those agents did become agents for defendant and secured, through Schmieding's intermediation, licenses as such agents. By April, 1950 plaintiff had procured for defendant some forty-three agents of whom twenty-four had worked for him prior to January 1, 1950.

In arranging for local agents in behalf of defendant, plaintiff, representing defendant, signed, on forms supplied by defendant, local agent's agreements, a specimen of which forms an exhibit received upon the trial. He did not himself sign any such local agent's agreement constituting himself as a local agent. Nor did he sign one as local agent, joining with defendant acting in its own behalf.

On September 30, 1950, defendant, in writing duly transmitted by mail to plaintiff, and received by plaintiff in due course of post, notified plaintiff that it was then terminating, effective on October 1, 1950, the district manager's agreement. Plaintiff in all respects recognized and acquiesced in this termination. Very shortly thereafter one Kurlinsky, state supervisor or instructor for defendant, called at plaintiff's office to talk with plaintiff and plaintiff dismissed him and declined to confer with him on the ground that he "had nothing to do with defendant". On October 6 or 7, 1950, Kurlinsky again came to plaintiff's office and with the concurrence of plaintiff took up in behalf of defendant all of defendant's supplies, rate books, home office record cards and agent's contract forms, that then remained in plaintiff's possession.

Sometime in March, 1951, one Kintsler, district manager of defendant from Fremont, Nebraska, came to plaintiff's office and asked plaintiff to pay him for the use of defendant $4 each as state license fees for renewal of Nebraska agents' licenses in behalf of defendant, to W. D. Schmieding (plaintiff's son and one of his agents) and plaintiff himself. Plaintiff on this occasion refused the request and ordered Kintsler out of his office.

On January 1, 1950 defendant had in force in Nebraska only five or six policies of insurance and had no organized agency force operating within the state.

Defendant's Nebraska business was substantially increased thereafter. Plaintiff introduced as evidence upon the extent of such business, answers by defendant to certain interrogatories propounded by plaintiff, by which it is shown that defendant from its Nebraska operations derived gross premiums after January 1, 1950 as follows:

| Interval [6] | From New Business | From Renewals |
| --- | --- | --- |
| January 1, 1950 to October 1, 1950 ........ | $5,635.81 | $ 190.05 |
| October 1, 1950 to September 12, 1951 ...... | 3,692.96 | 2,955.61 |
| September 12, 1951 to May 12, 1952 ........ | 964.28 | 2,915.70 |

That showing is effective up to the service of process in the present action and is found fairly and correctly to state the defendant's premium receipts from Nebraska business for the intervals indicated above. This finding is made despite certain computations somewhat inconsistent with it offered by plaintiff in the course of his testimony.

That business in 1950 and much of it in 1951 and in diminishing degree thereafter was written by local agents recruited for defendant by plaintiff and in substantial measure by agents who, before January 1, 1950, had represented Western Plains Insurance Company.

Defendant is still doing business in Nebraska and some of its presently commissioned agents are persons who were recruited for it by plaintiff. Not all of the agents so recruited have continued with defendant.

Despite the express averments of plaintiff, the court finds that the agreement or arrangement between the parties touching the countersignature of defendant's policies by plaintiff, first in his proper person, later through the agency of employees of defendant in its home office, and finally by the use of the rubber stamp was not expressly understood to be a part of the district manager's agreement. Its relationship to that agreement was not explicitly defined by the parties when it arose. The written district manager's agreement itself, undertakes expressly to repel the inference which plaintiff advances, and does it by several provisions excluding from its reach all unincorporated collateral engagements. But that is not the principal ground for the finding in this paragraph first set out. It is true that at one place in his testimony plaintiff positively declared that at the Nebraska insurance department when the subject was discussed he said in substance in the presence of Mr. Rydman, the Assistant Insurance Director, and Mr. Doherty and Mr. Perry, who was then plaintiff's attorney, "that this stamp and the use of this stamp was and is part of my district manager's contract and must be stopped if my district manager's contract is canceled". The court finds that no such statement was made. Upon cross-examination, plaintiff repeated the story of its making, but

6. It will readily be observed that the intervals next set out do not exactly correspond to those outlined in the complaint. They do conform to the manner in which the case was tried. Thus the first interval is from the inception of the district manager's agreement to the date of its effective cancellations; the second from that cancellation to the date on which defendant received plaintiff's demand for the abandonment of the use of the stamp; and the third from the date last identified to the date of the service of process in this action.

with an allowable inference that he made it only to Mr. Rydman who represented the insurance department. Mr. Doherty denied that he heard it or anything like it. Neither Rydman nor Perry was called as a witness. Besides, the making of such a statement is quite incredible. It would have reflected an unnatural and uncanny prescience. And it would have been uncongenial to the setting in which it is claimed to have been made. Plaintiff and Doherty had only recently theretofore set up a business program from which they anticipated pleasant relations and profitable results. They were thinking in terms of an enduring association, not of the incidents of its dissolution. As well expect a bride expressly to condition the plighting of her troth upon the details of a possible divorce settlement. It is, indeed, possible, but so far unlikely as to be intrinsically unworthy of belief.

Notwithstanding the discussion of the last paragraph, the arrangement or agreement respecting countersignature and the stamp and its employment were not wholly unconnected with the district manager's agreement. And it was not, as defendant contends, exclusively a part of an arrangement whereby plaintiff became, and was licensed as, a local agent of defendant. The truth is that both the problem and arrangement touching countersignature and eventually the stamp and the licensing of plaintiff as one of defendant's local agents were afterthoughts independently considered and resolved upon, but prompted by practical features of the operation of the then newly executed district manager's agreement. Therefore, they were connected with the district manager's agreement, not by reason of any explicit declaration or understanding to that effect, but rather from the circumstances of their origin. Apart from the district manager's agreement, plaintiff was not interested in being, and would not have become, one of defendant's local agents. Another thing is true. He became a local agent to the end that he might with authority countersign policies; he did not agree to countersign policies as an incident to his local agency.

The defendant did not abandon the use of the signature stamp upon its termination, effective October 1, 1950, of the district manager's agreement. Neither theretofore nor about that time did either party give any notice to, or make any demand upon, the other expressly taking a position upon the use of the stamp. And defendant continued generally to use it and to impress it upon Nebraska policies written by it. That use persisted until September 12, 1951 on which date defendant received by United States mail a letter from Messrs. Johnston, Grossman & Cashen, counsel for plaintiff, dated either September 6, 1951 or September 10, 1951 (more likely the latter date) demanding that the employment of the stamp be ended. The demand was complied with. The stamp itself was returned to plaintiff late in February, 1954.

While plaintiff as a witness stated that it was somewhere between the middle and the last part of August, 1951 when he first learned that defendant had continued, beyond October 1, 1950, to use the signature stamp, the court finds that that statement is not correct or true. Of the policies which the evidence shows to have borne the stamped signature two are brought so nearly home to him that he must have known of the use of the stamp. One is an automobile policy in favor of his son, W. L. Schmieding, bearing date June 21, 1951 in the writing of which plaintiff appears to have acted as an agent. The other is an automobile policy in favor of Western Plains Insurance Company issued July 3, 1951. The insured is the plaintiff's own corporation. Then, too, in his effort to establish alleged injuries to him arising out of the reactions of some of "his" local agents, he indicates pretty clearly an understanding before August, 1951 that defendant was still using the stamp.

The court is also convinced that plaintiff knowingly acquiesced after October 1, 1950 in the use of the stamp. His re-

lation to the two policies mentioned in the preceding section supports that view. Equally so does the history of a policy written or renewed even later. The insured was Clara A. Schmieding, whose relationship to plaintiff is not shown. Upon the issuance of that policy the plaintiff himself is shown as the local agent. And in November, 1951 the agent's commission for its procurement was paid to and received by Western Plains Insurance Agency, which simply means the plaintiff. Then, in the Spring of 1951, plaintiff expressly approved of the placing by one of "his" agents of an automobile policy with defendant but directed him to write no more after that.

Plaintiff claims that he did not personally solicit as local agent the placing of any insurance with defendant at any time after January 1, 1950. In the sense of general solicitation that is found to be true. But as Western Plains Insurance Agency, he did place such insurance, including renewal policies and receive and collect the agent's commissions therefor.

Plaintiff claims to have laid out both time, and, in the way of expense, money in the servicing after October 1, 1950 of certain identified policies of insurance theretofore written by defendant. In this connection, he identifies charges for time and claims for expense aggregating, as the court computes them, $299.85, but which he appears to reckon as $295.35. And he explains the nature and purposes of his efforts. Of them it has to be said that they all occurred after October 1, 1950 and none of them at the behest or suggestion of defendant. They were, with one exception, voluntary gestures on his own part in cooperation with a few of "his" agents who had written policies for defendant on which claims or minor controversies arose; and plaintiff offered suggestions to his agents which, as he states, helped them to effect settlements. The remaining and excepted item was an inexactly defined claim involving a Mr. Chris Abbott, now deceased, and in his lifetime a director of defendant. It involved a claim under one of defend-

ant's policies that was eventually adjusted.

The court upon the whole record finds that plaintiff has failed to prove that he has sustained any injury or damage as the proximate consequence of defendant's use after October 1, 1950 of the signature stamp. Some effort was made in that direction, but it was quite inadequate and unconvincing. Some five or six of the local agents who had written insurance for Western Plains Insurance Company and on plaintiff's procurement had undertaken to write for defendant were produced by him as witnesses. Their testimony followed a fairly common pattern. They told of their earlier relations with plaintiff and their assumption on his prompting of agencies for defendant. Then, they spoke of learning of the defendant's termination of plaintiff's district manager's agreement and of their observing at somewhat later dates the continued use of his name on policies to which it had been affixed by means of the rubber stamp. On those facts and the inconsistency between the termination of his authority and the continued use of his name, they professed in some instances to have experienced an impairment of confidence in plaintiff. But whether such impairment was because of the persisting use of the stamp or because of the termination of the district managership (which was by written contract within the undoubted right of defendant) is left in grave uncertainty. Some of them also testified that their sales of insurance for Western Plains Insurance Company were substantially reduced after 1950. But there is a failure adequately to establish the factors entering into any such reduction. Some of the agents attributed it to a loss on their part of confidence in the plaintiff, resulting in diminished enthusiasm and effort. Too many of the ingredients of successful selling were left out of the evidence. Besides, their testimony was measurably neutralized by their readiness to rally to the support of the plaintiff. They were closely friendly witness-

es, not men who walked no longer with plaintiff from suspicion of his integrity.

Nor is it considered significant, although it is found to be true, that of the agents working for Western Plains Insurance Company on January 1, 1950, some seven were not thus associated at the time of the trial. It is not shown to the court's satisfaction that any act of defendant caused the defection of all or any of them.

There is evidence before the court— and the court finds—that from time to time after October 1, 1950 plaintiff underwent both hospitalization and medical treatment for which he was subjected to some undetermined charges by way of expense. But the record is void of any evidence which persuasively attributes any such treatment to any act of defendant. Plaintiff also testified that in consequence of the falling income of Western Plains Insurance Company for 1951 and his inability to find the cause thereof he underwent a depressed feeling. But such depression, if any existed, is not shown to have been proximately caused by the conduct of defendant. There is a complete want of scientific evidence justifying the attribution of any impairment of plaintiff's health to proximate causation by any established conduct on defendant's part.

■■■ There are no procedural legal problems in the case. The substantive law is that of Nebraska. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. That law is to be gathered from the state's statutes or the decisions of its courts where these are available, and, in areas within which neither the legislature nor the courts of the state have marked the way, by the judicial appraisal of the probable course of Nebraska's court of last resort in the light of those factors that would reasonably be expected to guide that court. Yoder v. Nu-Enamel Corporation, 8 Cir., 145 F.2d 420; Yoder v. Nu-Enamel Corporation, 8 Cir., 117 F.2d 488; Mogis v. Lyman-Richey Sand & Gravel Corporation, 8 Cir., 189 F.2d 130, affirming, D.C.,

90 F.Supp. 251, rehearing denied 8 Cir., 190 F.2d 202, certiorari denied 342 U.S. 877, 72 S.Ct. 168, 96 L.Ed. 659; Mattson v. Central Electric & Gas Co., 8 Cir., 174 F.2d 215, certiorari denied 338 U.S. 868, 70 S.Ct. 142, 94 L.Ed. 532; rehearing denied 338 U.S. 896, 70 S.Ct. 238, 94 L.Ed. 551.

During the trial upon plaintiff's offer, ruling was reserved, pending an examination, closer than was then possible, concerning the admission in evidence of the interrogatories and answers thereto identified as Exhibits 21, 22 and 23. The examination has been completed and it may be understood that the interrogatories and answers have been received in evidence.

Upon the completion of plaintiff's evidence defendant moved for dismissal of the action except as to commissions due plaintiff for the period between January 1, 1950 and October 1, 1950, generally for the inadequacy of evidence in support of it. As there was then a necessity, for other reasons, to adjourn the completion of the trial, briefs were received and considered upon the motion. On the reconvening of the court for the completion of the trial, the motion was denied and overruled, but with the reservation to the court of authority to pass upon the issues tendered in the final ruling. That reservation persists. But the ruling now made may be understood to rest upon all the evidence, that presented by defendant as well as that received for plaintiff.

Consideration has been given to each claim made in his petition and supplementary complaint by the plaintiff and reflected in separate counts or causes of action. These claims are reasonably separated by plaintiff into demands rooted in defendant's acts during well-defined intervals of time. However, in his petition he does not always correctly assign the dates which are the termini of those intervals. They were more exactly reflected upon the trial and in the briefs of counsel. And in its further announcement of ruling the court will undertake to keep within the intervals according to

their respective defining incidents and correct dates.

 Count I, supra, is a demand for an accounting of commissions due plaintiff from defendant on business in Nebraska from January 1, 1950 to the defendant's termination of the district manager's agreement, which actually was effective October 1, 1950 and for judgment accordingly. Apart from an alleged—and admitted—failure by defendant to pay such commissions in full, the case reflects no litigable controversy covering this period. Upon the issue of the amount due him, plaintiff has the burden of proof. For that initial interval defendant concedes that it owes plaintiff $33.37 in earned and unpaid commissions. While plaintiff appears generally to approve defendant's records for the period, he advances the view that the deficiency is somewhat larger. But the court concludes that he has failed to establish the larger figure by a preponderance of the evidence. Upon Count I, therefore, the court finds and adjudges that there is due from defendant to plaintiff the sum of $33.37 for which judgment is awarded to plaintiff.

Count II of the petition demands an accounting and judgment in plaintiff's favor on the score of commissions asserted to be payable to plaintiff out of premiums on policies written in Nebraska by defendant from the termination of the district manager's agreement, i. e., October 1, 1950 "until the defendant ceased and has ceased to operate under said agreement" etc. Generally, that interval has been treated by the parties and the court as ending, according to any understanding, upon the procurement of service of summons in this case, which occurred on May 12, 1952. (The court pauses here to emphasize its own finding that the abandonment of the use of the stamp actually occurred on September 12, 1951). The supplementary complaint may be considered in association with Count II of the petition, because that supplement takes up the issues as of the institution of this suit and, alleging that the defendant persisted thereafter in its alleged use of plaintiff's name and agents, demands further accounting and judgment for the period beginning with the institution of the action and continuing to the filing of the supplement and even thereafter so long as the matters complained of may persist.

The claims thus reflected in Count II and the supplementary complaint really differ only in the separation into two intervals of plaintiff's demands. The court is persuaded that recovery may not ·be allowed in respect of any part of those intervals.

It has to be remembered that each of those two claims is made under the district manager's agreement bearing date January 10, 1950. They proceed upon the assumption that by its conduct after October 1, 1950 defendant subjected itself to liability under that agreement in like manner and measure as if it had not been terminated. The court rejects that position in its entirety.

The district manager's agreement contained the following language touching cancellation: "This agreement * * * may be cancelled by either party hereto as of any date by giving prior notice in writing to the other party of the termination. In event of termination of this contract by either party hereto, the district manager shall not be entitled to receive compensation after the date of such termination, except any unpaid overwriting on business issued prior to the date of termination according to the schedule of overwritings attached to this agreement." Plaintiff's claim to compensation under the agreement as such, thus seems to be alien to the thought of the instrument itself.

 And it is without adequate factual support as well. The actions of defendant essentially complained of in this connection are two. The first is the use of the signature stamp after October 1, 1950 which continued only until September 1, 1951 and is, therefore, no basis for the demand made in the Supplementary Complaint. The second is the persistence after October 1, 1950 of the em-

ployment by defendant of Nebraska agents secured for it by plaintiff, perhaps with special emphasis upon those agents who were representatives of Western Plains Insurance Company on January 1, 1950 and theretofore. The defendant's retention beyond the date of cancellation of agents recruited for it by plaintiff violated no right of plaintiff. It was simply a matter with which he was not properly concerned.

And even for the use of the signature stamp after October 1, 1950 plaintiff makes out no case for the awarding to him of a judgment in the aggregate amount of commissions upon the business done in Nebraska by the plaintiff after that date at the rate or rates set out in the district manager's agreement. Under the agreement the manager's commissions were to be paid in return for many services to be performed continuously by him. Those services are emphasized in the agreement (footnote 1). Without unnecessary quotation reference is made to paragraphs numbered 1 and 3 of the general agreements of the parties and to the entire thirteen paragraphs of the district manager's personal agreements as set out in the footnote. It was only "in return for these services" (see paragraph 1 of further agreements) that defendant agreed to compensate the district manager; and it is manifest from the entire agreement that he was to be compensated only while he was in fact the district manager.

Now, it has already been found that plaintiff acquiesced in the termination of his agreement as district manager. He was, indeed, resentful of defendant's action; but he accepted it as effective and final and was emphatic upon that point in his dealings with defendant's representatives. Moreover, he surrendered the records and files proper to his former position. And he ceased entirely to perform any of the duties upon him imposed by the district manager's agreement. He fails utterly to show that after October 1, 1950 he did the things for which alone he was, under the agreement, to receive compensation in the way of commissions at prescribed rates.

And it may finally be observed that there is no basis, either contractual or evidentiary, for the formulation of a schedule of compensation to plaintiff for the use of the signature stamp, even if it be granted or held to have been unauthorized. In fact, plaintiff asserts no claim based on the value of a license for such use.

Count III of the plaintiff's original complaint differs from the rest of his claim in that it is a claim for damages as such, based on the alleged tortious conduct of defendant as quoted in the court's earlier analysis of that count, supra. That alleged conduct involves the continued use of the signature stamp, with the asserted consequence of holding out to the insurance buying and selling public that plaintiff was still defendant's district manager and resident agent. Plaintiff asserts that such use resulted to the financial advantage of defendant and to the injury of plaintiff. The plaintiff argues that the challenged action of defendant constituted the tortious invasion of his right of privacy for which he should be awarded damages.

It must, first, be recognized that Nebraska has neither recognized, nor expressly denied, the existence of a remedy for recovery of damages on account of the violation of the right of privacy. Both parties grant that to be the posture of the state's law. It has no statute upon the subject and the decisions of its supreme court are silent concerning it. This court is of the opinion that if and when the issue is presented to that court it will not recognize the existence of a right of privacy whose violation shall give rise to a civil liability in the absence of a then controlling statute. That court has been disposed to leave to legislative action the creation of new, or the alteration of existing, bases of civil actions. Muller v. Nebraska Methodist Hospital, 160 Neb. 279, 70 N.W.2d 86. It must be acknowledged, too, that although in recent years some states

have recognized and defined the so-called right of privacy in the field of Torts, the recognition is by no means general nor the basis of the right stable or certain. 41 Am.Jur. 926, Title Privacy, Section 4.

■ But, even if a cause of action may be considered to exist in a proper case supporting the recovery of damages for the violation of the right of privacy, the facts here established do not disclose such a proper case. The plaintiff has failed to satisfy the court of the consistency of his position in opposition to the use of the signature stamp and on the contrary has so acted as to lead the court to the opinion that for a considerable time before September 12, 1951, he tolerated, even participated in, such use, aware that it was being made. Of course, this action presents no example of the use of a man's name wholly without any permission from him. In its inception the use was explicitly approved, even in writing. The question arises upon the persistence of the use beyond the termination of the district manager's position. Plaintiff was aware on October 1, 1950 of the presence of the signature stamp in defendant's home office and of defendant's possession of his letter giving ostensibly sweeping authority for its use in the countersignature of policies. He could, then or at any time thereafter, have forbidden its use, or, better still, have demanded the return of the stamp; or he could have done both. For nearly a year he did neither. Meanwhile, he was out in the territory in contact with the agents whom he characterized as his own. It is difficult to suppose that with those associations he failed for any measurable period of time to come upon the open and unconcealed use of the stamp.

Finally, upon the facts already found and discussed touching alleged damage to plaintiff from the use of the signature stamp, the court concludes that he has not established any such damages as the proximate result of such stamp. Those facts will not now be repeated or again commented upon. It is sufficient simply to say that neither plaintiff's contacts with several of his agents principally concerning claims, nor any anxiety into which he may have fallen, nor his hospitalization or medical treatment are shown, in the court's appraisal, to have been caused by the use of the signature stamp or by any aspect of defendant's established business practices after October 1, 1950. Plaintiff does not attribute any of his problems to the termination of his district managership. Nor could he well have done so. In that course defendant merely exercised a right which it reserved from the first, and for whose employment, regardless of motive, it was not made answerable to any one.

Accordingly, the judgment of the court will be for the defendant and against the plaintiff upon each of Counts II and III of the original petition and the supplementary complaint.

But judgment is not being entered concurrently herewith. In the light of the history of the action and the presently announced result some question may arise upon the matter of costs. Naturally, it has not been discussed by counsel. So, an opportunity is being given by an order for oral argument upon that question. Upon its disposition, judgment will be entered in accordance with this announcement and the ruling touching costs.

### Supplemental Opinion

In announcing its ruling on the merits of this action, the court reserved for further consideration the taxation of costs and invited counsel for the parties to assist it by the submission of their views upon the question, which, naturally, they had not theretofore discussed. Counsel have now presented oral argument and briefs upon the reserved point.

By Fed.Rules Civ.Proc. rule 54(d), 28 U.S.C.A., it is provided in part that:

"Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of

course to the prevailing party unless the court otherwise directs.".

It is not suggested by counsel or considered by the court that the express exception of the rule is brought into operation by any statute of the United States or provision of the Rules of Civil Procedure.

Therefore, it would appear that plaintiff, having recovered judgment against defendant under the ruling made upon the whole case, should be allowed to recover costs, unless the record presents some consideration upon which the court should be moved to direct otherwise. Two possible considerations of that sort have been examined and made the subject of comment by counsel. Both arise out of the history of the case.

The action was removed on the basis of diversity of citizenship, to this court from the District Court of Lancaster County, Nebraska in which plaintiff instituted it. The presiding judge was led, from that circumstance, to inquire, first, whether the Nebraska law upon the taxation of costs might, in view of the amount of plaintiff's eventual recovery, operate mandatorily to deny him the right to recover costs, and secondly, whether the local law of Nebraska should be so far considered as to control the exercise of the court's discretion in the taxation of costs.

By Section 27–102, R.S.Neb.1943, Reissue of 1948, it is provided with presently immaterial exception that:

"Justices of the peace shall have jurisdiction in all cases where the sum in question does not exceed two hundred dollars."

And by Section 25–1709, it is provided, in respect of costs, that:

"If it shall appear that a justice of the peace has jurisdiction of an action and the same has been brought in district court the plaintiff shall not recover costs."

Applying the language last quoted, the state's supreme court holds that, it is governed not by the amount claimed but by the amount recovered. Stake v. Western Assurance Co., 136 Neb. 735, 287 N.W. 222; Frazer v. Myers, 95 Neb. 194, 145 N.W. 357; City of Hastings v. Mills, 50 Neb. 842, 70 N.W. 381; Shields v. Gamble, 42 Neb. 850, 61 N.W. 101. If, therefore, the case had remained in the court in which plaintiff started it and there resulted in a final judgment upon the claim such as the court has announced, plaintiff could not have recovered costs. And the query was prompted whether a different result should be allowed here.

The answer appears to be that Rule 54(d) governs; and the provisions of the state law may be considered by the court in determining whether, under that rule, it shall "direct otherwise", but is not controlling either in requiring such direction or in moulding its course. Fishgold v. Sullivan Drydock & Repair Corporation, 328 U.S. 275, 284, 66 S.Ct. 1105, 90 L.Ed. 1230; Thomson v. United Glazing Co., D.C.N.Y., 36 F.Supp. 527; Kellems v. California C. I. O. Council, D.C.Cal., 6 F.R.D. 358.

After due reflection the court has concluded that the history of the action does not require it to exercise its discretion by relieving the defendant either entirely or partially from the burden of costs which, under Rule 54(d) supra, ordinarily follows the judgment. Plaintiff instituted the action in the state court. It was defendant which brought it here, and thereby took it out of the state court. Defendant can hardly complain if by that action it is deprived of a state court rule on costs more favorable to it than obtains in this forum.

The judgment, therefore, provides that the costs of the action be taxed against defendant. It is being made and given concurrently with the filing of this memorandum.